STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

PRAXAIR, INC.,

Plaintiff,

v.

AIRGAS, INC., NATIONAL
WELDERS SUPPLY COMPANY,
INC., MARK R. BERNSTEIN and JUDITH
CARPENTER AS CO-EXECUTORS OF THE
ESTATE OF J.A. TURNER, JR., and
JUDITH CARPENTER,

Defendants.

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
98-CVS-008571

**ORDER AND
OPINION**

{1}     This matter is before the Court on Defendants' Motion for Summary Judgment and Motion in Limine to Exclude Praxair Experts.  Defendants' Motion in Limine requires the Court to exercise its "gatekeeping" function to ensure that the proffered nonscientific expert witness rest on a reliable foundation.  For the reasons explained below, Defendants' Motion in Limine is granted in part and denied in part.  In addition, the Court finds that genuine issues of material fact exist, and therefore Defendants' Motion for Summary Judgment is denied.

> *Womble Carlyle Sandridge & Rice, PLLC, by William C. Raper, Debbie W. Harden and Andrea Del Duca; Sidley & Austin, by Anne E. Rea; Eimer Stahl Klevorn & Solberg, by Nathan P. Eimer, David M. Stahl  and  Lisa S. Meyer; General Counsel for Praxair, Inc., by Gerald P. Reidy,   for Plaintiff Praxair, Inc.*

> *Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Mark W. Merritt, Thomas P. Holderness and Julian H. Wright, Jr.; Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., by Broox G. Holmes, Edward A. Dean and M. Kathleen Miller, for Defendant Airgas, Inc.*

> *James, McElroy & Diehl, P.A., by Edward T. Hinson, Jr., Richard B. Fennell, Jennifer A. Youngs, Katherine Line Thompson Kelly and John S. Arrowood, for Defendants National Welders Supply Company, Inc., Mark R. Bernstein and Judith Carpenter as Co-Executors of the Estate of J.A. Turner, Jr., and Judith Carpenter.*

## I.

### Statement of Facts

{2}     This case arises out of two separate business transactions – a Right of First Refusal ("RFR") entered into between National Welders Supply Company ("NWS") and Union Carbide Industrial Gases, Inc. (now Praxair, Inc. or "Praxair"), and a Joint Venture Agreement ("JVA") entered into between NWS and Airgas, Inc. ("Airgas").  In conjunction with NWS' purchase of certain assets from

Praxair, on March 25, 1991, the companies entered into the RFR, which defined various triggering events under which Praxair would have, for the fifteen years following, certain rights to purchase the stock of NWS. One such triggering event was a "Change in Control," the definition of which was specifically set forth in the RFR.

{3}     In 1995, Mr. Turner, founder of NWS, began negotiating with both Praxair and Airgas for the sale of a portion of NWS. Eventually, the negotiations ended with NWS and Airgas entering into the JVA, under which Airgas acquired 47 percent of the NWS stock. The JVA further provided the Turners with four distinct options which could be exercised in 2006, the year the RFR between Praxair and NWS expired. Included in those options was the right either to put the remaining NWS stock in exchange for Airgas stock or to require redemption of the remaining NWS stock for cash.

{4}     On June 16, 1998, Praxair filed this action against Defendants claiming that the JVA violated the terms of the RFR between NWS and Praxair. Defendants filed motions to dismiss pursuant to Rule 12(b)(6) and Rule 12(c) of the North Carolina Rules of Civil Procedure contending the JVA was not a breach of the RFR and that Praxair's claims should therefore be dismissed. By Order dated May 26, 1999, this Court found that the terms of the JVA did not, on their face, violate the RFR. Accordingly, the Court dismissed Praxair's claims to the extent that they could be read to assert a cause of action for breach of contract based upon a legal interpretation of the express language of the JVA and the RFR.

{5}     Additionally, Praxair contended in its original Complaint that NWS and the Turner family violated Praxair's rights under the RFR because the JVA was a "sham transaction" designed to hide the fact that the Turners secretly agreed to sell NWS to Airgas in a two-step transaction. (Compl. ¶ 1, Nature of the Action.) Praxair contends that this "sham transaction" is the basis for the causes of action alleged in its complaint. The Court found that Plaintiff successfully pled facts supporting claims against NWS and Airgas based on the theory that Airgas, NWS and the Turner family entered into a side agreement or oral understanding that may be contrary to the express terms of the JVA. Specifically, the Court held:

> The drafters of the [JVA] were successful in avoiding triggering Praxair's rights under the RFR primarily because the agreement left Airgas at risk that whoever owned or controlled the Turner Family stock in 2006 could elect to retain ownership of the stock or sell it to someone else . . . . If, however, the Turners and Airgas have agreed that the Turners will sell or exchange their National Welders stock for Airgas stock or cash regardless of the conditions in 2006, thus eliminating any risk to Airgas that it would be left owning 47% of National Welders, Praxair's contractual rights have been violated.

{6}     *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC 5 at 20 (No. 98 CVS 008571, Mecklenburg County Super. Ct. May 26, 1999) (Tennille, J.). Although the Court reconsidered its May Order upon the

motion of Praxair, the Court declined to alter its previous rulings. *See Praxair, Inc. v. Airgas, Inc.,* 1999 NCBC 9 (No. 98 CVS 008571, Mecklenburg County Super. Ct. Oct. 20, 1999) (Tennille, J.). Following close of discovery, Defendants moved for summary judgment and filed motions in limine seeking exclusion of certain expert testimony.

## II.

## Admissibility of Expert Opinions

{7}     The Court turns first to a consideration of Defendants' Motion in Limine.

## A.

## Motion in Limine

{8}     As an initial matter, the Court considers the appropriateness of the timing of Defendants' Motion in Limine. Praxair points out that the only expert testimony it currently seeks to admit is the expert testimony presented in Praxair's response to Defendants' Motions for Summary Judgment; therefore, Praxair argues, the motion is premature and should be treated as a motion to strike.

{9}     The Court agrees that it is premature to rule on a motion in limine to exclude the testimony of certain experts at trial. A motion in limine must be considered in light of the issues presented for trial. Those issues may differ from the issues before the Court in ruling on Defendants' Motion for Summary Judgment. Therefore, the Court will consider the motion in limine and the proffered expert testimony in connection with the issue currently to be decided – whether there is a genuine issue of material fact as to the existence or nonexistence of a secret agreement to transfer 100 percent of the NWS voting stock to Airgas outside of the JVA. However, the Court's ruling should provide some guidance to the parties with respect to the admissibility of certain expert witness testimony offered at trial.

## B.

## Supreme Court's Requirements for Expert Testimony

{10}     There are three primary requirements for the admission of expert testimony: relevance, qualification and reliability. *See State v. Goode*, 341 N.C. 513, 526-29, 461 S.E.2d 631, 639-41 (1995). The threshold test for the admissibility of all evidence is relevancy. N.C.G.S. § 8C-1, Rule 401 (1999). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination to the action more or less probable than it would be without the evidence." *Id.*; *see also State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989).

{11}     In addition to being relevant, expert witness testimony must also meet specific requirements. Rule 702 of the North Carolina Rules of Evidence governs the admission of expert testimony. The rule

states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1999). In order to admit expert testimony under Rule 702, the proponent must establish that the witness is qualified to testify as an expert on the subject about which the testimony is offered. *See State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995). North Carolina courts require that an "expert [be] better qualified than the jury as to the subject at hand," and that his testimony be "'helpful' to the jury." *State v. Davis*, 106 N.C. App. 596, 601, 418 S.E.2d 263, 267 (1992) (citing *State v. Huang*, 99 N.C. App. 658, 663, 394 S.E.2d 279, 282 (1990); *See also State v. Howard*, 78 N.C. App. 262, 270, 337 S.E.2d 598, 604 (1985). Thus, an expert must possess some specialized knowledge putting him in a superior position to evaluate the evidence. Simply having some expertise is not enough; an expert witness must give testimony that assists the trier of fact.

{12}     As mentioned above, reliability is the third requirement for the admission of expert testimony. This requirement has troubled the courts and has been the subject of numerous court decisions in recent years. Until the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the prevailing standard for determining the reliability of expert testimony was whether the methodology employed by the expert was "generally accepted" among the relevant scientific community. *See, e.g., Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). However, in *Daubert* the Court considered the language of Rule 702 and found that the drafters of the Federal Rules did not intend to incorporate the *Frye* test into the standard for admissibility of expert testimony. 509 U.S. at 587. With its decision in *Daubert*, the Supreme Court rejected the "generally accepted" test, finding it at odds with the "'liberal thrust' of the Federal Rules," and instead adopted a multi-factor approach to determining reliability. *Id.*

{13}     Based on the language of Federal Rule 702, the *Daubert* Court found that admissible expert testimony must be based on scientific knowledge that will assist the trier of fact. *Id.* at 590. The Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* To determine whether the proffered testimony meets these requirements, the trial court is required to make a preliminary assessment of whether the reasoning or methodology is reliable or valid. *Id.* at 593. The Court enumerated several factors relevant to determining whether an expert's testimony is based on a reliable methodology: (1) whether the methodology or theory has been tested;

(2) whether the methodology has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the relevant scientific community. *Id.* at 593-94. However, the Court noted that it did not intend to set out a definitive checklist, but instead stated that there may be several factors bearing on the issue of reliability. *Id.* at 593. Thus, with *Daubert* the Court imposed on trial judges a "gatekeeping" obligation by "assign[ing] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.

## C.

### Reliability of Nonscientific Expert Testimony

{14}    Despite the *Daubert* Court's attempt to establish some guidelines for assessing the reliability of expert testimony, the decision created confusion among the federal circuits. Specifically, the circuits disagreed about whether the gatekeeping responsibility applied to nonscientific expert testimony, and if so, whether the *Daubert* factors were appropriately applied to such testimony. The Court attempted to answer these questions in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Court found that the principles identified in *Daubert* applied equally to nonscientific testimony. *Id.* at 147-48. The Court reasoned that Rule 702 makes no distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. *Id.* at 147. Instead, "it is the Rule's word 'knowledge' . . . that 'establishes a standard of evidentiary reliability.'" *Id.* Therefore, regardless of the type of expert testimony under consideration, the judge must assume the role of a gatekeeper, preventing the admission of opinions lacking a reliable basis.

{15}    The *Kumho Tire* Court also held that when assessing the reliability of expert testimony, the trial court *may* consider the four factors enumerated in *Daubert*. *Id*. at 150. However, the Court recognized *Daubert* factors may not be helpful in assessing the reliability of nonscientific evidence. *Id.* The Court concluded that it could "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . . Too much depends upon the particular circumstances of the particular case at issue." *Id.*

{16}    The *Kumho Tire* Court noted that, in rejecting the "generally accepted" test as the sole method to assessing reliability, the *Daubert* Court was particularly concerned about the problem of the self-validating discipline. *Id.* at 151. Specifically, some disciplines may inherently lack reliability. *Id.* "It is not enough that the self-proclaimed experts who practice these disciplines accept the premises and techniques of the discipline. There must be some independent, objective indicium of the reliability of the discipline." Edward J. Imwinkelried, *Evaluating the Reliability of Nonscientific Expert*

*Testimony: A Partial Answer to the Questions Left Unresolved by* Kumho Tire Co. v. Carmichael, 52 Me. L. Rev. 19 (2000) [hereinafter *Imwinkelried*]. Therefore, the court necessarily must base its assessment of reliability on more than the *Daubert* "general acceptance" factor.

{17}     *Kumho Tire* did provide some guidance as to what factors may be helpful in assessing the reliability of nonscientific expert testimony. For example, in addition to considering whether the expert's method is generally accepted in the relevant community or whether the expert's preparation is of a kind that others in the field would recognize as acceptable, it may be helpful to consider how often an expert's experience-based methodology has produced erroneous results. 526 U.S. at 151. Additional guidance may be found from the factors that the Court determined weighed against the admission of the proffered tire expert's testimony: (1) the expert's qualifications; (2) the (im)precision of the expert's method; (3) the subjectiveness of the expert's mode of analysis; (4) the short amount of time the expert spent conducting analysis; (5) the fact that the expert reached a preliminary conclusion before he conducted the analysis; and (6) the expert's failure to adequately explain other possible causes. *Id.* at 153-57.

{18}     While one can glean from the *Kumho Tire* decision a list of factors that may be helpful in assessing a nonscientific expert's reliability, the *Kumho Tire* Court purposely refrained from establishing a checklist similar to the one contained in *Daubert*. Instead, *Kumho Tire* left the reliability determination entirely up to the trial court based on the specific circumstances at hand in a particular case. Thus, the courts are left to determine what factors are helpful in assessing the reliability of nonscientific expert testimony in each case. The task of arriving at a set of relevant assessors of nonscientific expert testimony reliability poses unique problems for the courts. Each case may result in the application of different assessors or differences in the degrees of importance of the same assessors.

{19}     The cases following *Kumho Tire* provide some guidance with respect to assessing the reliability of nonscientific expert testimony. After reviewing recent case law, the drafters of the federal rules arrived at a set of factors useful to the courts in evaluating nonscientific expert testimony. A proposed amendment to Rule 702 of the Federal Rules of Evidence would change Rule 702 to read:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (proposed Dec. 2000). The Proposed Advisory Committee's Note to the amended

Rule 702 lists the factors courts have found relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include: (1) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; and (4) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See id* at 338, n.56.

{20}   The above discussion focuses on the Federal Rules of Evidence and federal case law interpreting those rules. The North Carolina Rules of Evidence are patterned after the Federal Rules. Therefore, although this Court is not bound by federal case law, these cases prove to be helpful in arriving at a list of factors relevant to assessing the reliability of the expert testimony proffered in this case. In addition, as mentioned above, factors relevant to determining the reliability of scientific testimony may be helpful in assessing nonscientific testimony. *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (affirming the decision of the trial court to disregard the opinion of a mechanical engineer based on a determination that his testimony was unreliable, noting that "[r]eliability of specialized knowledge and methods for applying it to various circumstances may be indicated by testing, peer review, evaluation of rates of error, and general acceptability."). For example, it may be useful to consider the expert's professional background, any independent research conducted by the expert, and the expert's use of established techniques. *See State v. Cardwell*, 133 N.C. App. 496, 505, 516 S.E.2d 388, 395 (1999) (evaluating the admissibility of expert testimony of a blood plasma analyzer); *State v. Goode*, 314 N.C. at 528, 461 S.E.2d at 640 (evaluating the admissibility of expert testimony regarding bloodstain pattern interpretation).

{21}   Praxair has five expert witnesses who may be called to testify at trial. The testimony of four of these proffered experts is offered in response to Defendants' Motion for Summary Judgment. While Defendants only question the reliability of one of Praxair's experts, ultimately the admissibility decision will depend not only on whether Praxair's experts are qualified and their testimony is relevant but also whether their opinions have a reliable basis. Praxair's experts have provided opinions on nonscientific matters, including business ethics, contract behavior, economics, finance and accounting. The Court will be required to evaluate this nonscientific testimony in light of the factors that it has determined are useful in assessing reliability. In determining the reliability of the nonscientific testimony of Praxair's experts, the Court believes that the following factors will be helpful: (1) the expert's qualifications; (2) the preciseness of the expert's method; (3) the subjectiveness of the

expert's analysis; (4) whether a preliminary conclusion was reached before the analysis was conducted; (5) whether the expert considered other alternatives; (6) whether the expert's method is generally accepted by the relevant community; and (7) whether the field of expertise is known to reach reliable results.

## D.

### Limits of Admissibility of Expert Opinion Testimony

{22}     In addition to determining the reliability of the nonscientific testimony of Praxair's experts, the Court must address the limits of admissible expert opinion testimony.  Rule 704 of the North Carolina Rules of Evidence states that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  N.C.G.S. § 8C-1, Rule 704 (1999).  However, there are limits to the scope of expert testimony.  For example, an expert may not testify that a particular legal standard or conclusion has been met; instead, it is for the court to explain to the jury the given legal standard at issue and how the ultimate legal conclusion should be determined.  *See HAJMM Co. v. House of Raeford Farms, Inc.*, l328 N.C. 578, 586-87, 403 S.E.2d 483, 488-89 (1991).  Thus, when evaluating the opinion testimony of expert witnesses, the court must distinguish between testimony that goes to the ultimate issue from testimony that improperly draws a legal conclusion.

{23}     In *Raeford Farms*, the North Carolina Supreme Court addressed the question of whether the trial court erred in admitting the testimony of an expert on equity redemption by agricultural cooperatives. *Id.* at 583, 403 S.E.2d at 487.  At trial, the expert witness testified to his opinion that the board of directors abused its discretion, that there was a fiduciary relationship, and that the fiduciary duty was breached.  *Id.*  The court explained that there is a distinction between legal conclusions about which testimony may not be admitted, and ultimate facts about which testimony is admissible.  *Id.* at 586, 403 S.E.2d at 488.  The court concluded that the expert should not have been permitted to testify that, in his opinion, there was a fiduciary relationship which had been breached.  *Id.* at 589, 403 S.E.2d at 490.  However, the expert's testimony regarding the underlying facts which were relevant to the jury's determination of whether there had been a breach of fiduciary duty was proper.  *Id.*  Thus, an expert may give opinion testimony regarding the underlying factual premises the jury must consider in determining the ultimate issue.  "Opinion testimony may be received regarding the underlying factual premise, which the fact finder must consider in determining the legal conclusion to be drawn therefrom, but may not be offered as to whether the legal conclusion *should* be drawn."  *Norris v.*

*Zambito*, 135 N.C. App. 288, 293, 520 S.E.2d 113, 116 (1999) (citing *Raeford Farms*, 328 N.C. 578, 403 S.E.2d 483 (emphasis in original)). "[W]hile the legal expert may testify regarding the factual issues facing the jury, he is *not allowed* to either *interpret the law* or *to testify as to the legal effect of particular facts.*" *Smith v. Childs*, 112 N.C. App. 672, 680, 437 S.E.2d 500, 506 (1993) (emphasis in original).

{24}    *Williams v. Sapp* provides further guidance. 83 N.C. App. 116, 349 S.E.2d 304 (1986). In *Williams*, the trial court allowed plaintiff's expert, who was an attorney, to give his opinion that the plaintiff was entitled to an easement by implication. The Court of Appeals disagreed, stating that "[e]xpressions of opinion on a question of law are not admissible into evidence." *Id.* at 118, 349 S.E.2d at 305. The court emphasized that although opinion testimony may embrace an ultimate issue to be decided by the fact-finder, not all opinions are admissible. *Id.* at 119, 349 S.E.2d at 305. Such a rule protects against the admission of opinions which merely tell the jury what result to reach. *Id.* The opinion is inadmissible if the question asked of the expert witness must also be answered by the jury. *Id.* at 120, 349 S.E.2d at 306.

{25}    Thus, in this case, Praxair's experts may testify to underlying facts that go to the ultimate issue, namely whether there is a separate, secret agreement between Airgas and NWS. However, Praxair's experts may not testify that, in their opinion, the defendants reached a secret agreement under which the NWS preferred shareholders are required to exchange or redeem the remainder of its NWS stock. Such testimony would merely tell the jury what result to reach. *See Raeford Farms*, 328 N.C. at 588-89, 403 S.E.2d at 490; *Williams*, 83 N.C. App. at 120, 349 S.E.2d at 306. "[T]he rules ought to be structured to force the proponent to educate the trier of fact rather than permitting the proponent to invite the trier of fact to simply defer to the expert." *Imwinkelried* at 31. Therefore, "[w]here the legal relations growing out of the facts are in dispute, and the witness's words appear to describe the relations themselves, the same words may be objectionable." 1 H. Brandis, *Brandis on North Carolina Evidence* § 130 (3d ed. 1988). Accordingly, Praxair's experts' testimony must stop short of opining that a secret agreement exists between Defendants.

### III.

### Experts Offered by Praxair

{26}    Praxair has named five expert witnesses whom they may seek to offer at trial. Praxair's offered the testimony of four of these witnesses in opposition to Defendants' Motion for Summary Judgment. The Court has considered the testimony of each of these four experts as submitted in Praxair's responsive briefs and found some of it admissible and relevant to facts at issue. Other parts of the

proffered expert testimony are inadmissible and therefore not properly considered in opposition to the motion for summary judgment.

{27}    As a threshold matter, the Court will not allow Praxair's experts to testify at trial that a secret agreement exists among Defendants. Allowing such testimony would allow Praxair's experts to draw a legal conclusion and to answer the very question before the jury. Courts have held that opinions which merely tell the jury the result they should reach are improper. *See Williams v. Sapp*, 83 N.C. App. at 120, 349 S.E.2d at 306. However, although Praxair's experts may not draw the conclusion that a secret agreement exists among Defendants, they may testify about factors and circumstances consistent with the existence of a separate agreement. While this distinction draws a fine line, the line is drawn short of the expert rendering an ultimate conclusion, thereby allowing the jury to make an independent decision about whether a separate agreement exists.

## A.

### Professor Thomas Donaldson

{28}    Defendants challenge the testimony of Professor Thomas Donaldson, who teaches and writes primarily about business ethics. Defendants do not argue that Professor Donaldson's testimony is irrelevant, as it clearly goes to the central issue in this case. Instead, Defendants contend that Professor Donaldson is unqualified to render the proffered opinions because his methodology is unreliable. After reviewing the transcript of Professor Donaldson's deposition and the affidavit submitted by Professor Donaldson, the Court questions both the reliability of his methodology and his qualification as an expert on the ultimate issue in this case.

{29}    The Court is troubled by Professor Donaldson's purported "methodology." Professor Donaldson explains that he has developed a "methodology for determining the existence of implicit norms and agreements." (Donaldson Aff. ¶ 2.) According to Professor Donaldson, "the criteria for testing for the existence of such implicit agreements are complex and vary on a case-by-case basis, but must have both an intentional and behavioral component." (*Id*.) Recognizing that the criteria vary on a case-by-case basis, the Court has nevertheless been unable to determine what criteria were utilized by Professor Donaldson when reviewing the evidence in this case. Praxair explains that Professor Donaldson's method "involves reviewing all the objective information available about both the transaction at issue and the parties involved, and evaluating this information based on Professor Donaldson's knowledge of economics, commercial and corporate behavior, business ethics and competitive theory." (Pl. Resp. to Mt. in Limine at III.A.2.)

{30}    A review of all the evidence and/or an evaluation of the totality of the circumstances does not

constitute a reliable methodology. Such a method is not subject to any peer review, nor is there any way to determine how often Professor Donaldson is right and how often he is wrong. There is no way to determine the rate of error in his methodology. There are no independent, objective indicia of the reliability of his method, nor has it been subject to peer review. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

{31} Courts have recognized that "the whole point of *Daubert* is that experts can not 'speculate.' They need *analytically sound* bases for their opinions" *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (emphasis added); *see also Ford Olinger v. USGA*, 52 F. Supp. 2d 947, 950 (N.D. Ind. 1999). Thus, the court needs enough information about an expert's methodology so as to evaluate the reliability of that methodology. The Court has not been given sufficient information to evaluate Professor Donaldson's testimony in light of the factors identified as useful to determine the reliability of a nonscientific opinion. In short, "[t]his record discloses a well-credentialed expert who employs an undisclosed methodology to arrive at disclosed opinions. This court cannot evaluate the reliability of the undisclosed methodology or of the principles that support the methodology." *Ford Olinger*, 52 F. Supp. 2d at 950. The Court has no information with which to assess the preciseness of Professor Donaldson's evaluation. In fact, Professor Donaldson's testimony leads the Court to believe that his analysis was fairly imprecise: he simply reviewed the documentation he found relevant.

{32} In addition, little information has been offered as to whether Donaldson's "method" is generally accepted by other contract behavior experts, nor has Praxair offered historical information which would help determine whether Donaldson's field of expertise is known to reach reliable results. For example, it would be helpful to have information about the known rate of error for those whose expertise is evaluating the existence of separate secret agreements.

{33} Finally, and perhaps most troubling, is the fact that Professor Donaldson's opinion seems to be influenced by his "integrative social contracts theory." Professor Donaldson explains that "[t]he key to [this] theory lies in the possibility of discovering implicit, or unwritten agreements, that may be found throughout economic life." (Donaldson Aff. ¶ 2.) Donaldson explains that he can assist the jury in "translat[ing] the code" of business transactions. (Donaldson Aff. ¶ 6.) This approach assumes that there is a known and agreed upon code to translate. In fact, Donaldson testified that that written contracts never completely embody the obligations of the parties. (Donaldson Dep. at 180-81.)

Donaldson's preliminary assumption is that every written agreement comes with separate oral or unspoken terms. Because of this assumption, Donaldson fails to consider the alternative – that the JVA is the complete embodiment of the agreement among Defendants. The Court believes that this assumption necessarily renders Donaldson's analysis, and his opinion, unreliable. It clearly has the capacity to confuse the jury. Therefore, the Court is of the opinion that Donaldson's methodology is inherently unreliable.

{34} In his affidavit, Professor Donaldson renders other opinions about rights of first refusal (RFRs). (Donaldson Aff. ¶¶ 13, 14.) Professor Donaldson believes that RFRs "lie at the heart of the market's ability to provide optimal outcomes for society." (Donaldson Aff. ¶ 13.) Professor Donaldson gives his opinion that when the spirit of a RFR is frustrated, economic freedom is endangered. (Id.) Additionally, Professor Donaldson says that RFRs are voluntary and do not constitute restrictions on alienation of property. (Donaldson Aff. ¶ 14.) It is a fundamental principle of the law that RFRs are restraints on alienation. *See Bryan-Barber Realty, Inc. v. Fryar*, 120 N.C. App. 178, 461 S.E.2d 29 (1995). Professor Donaldson's opinion about the value of RFRs is irrelevant, and his opinion about their effect on the market is both contrary to the law and to this Court's prior Order. Professor Donaldson further testifies that the JVA "resulted in the destruction of the [RFR]." (Donaldson Aff. ¶ 16.) This testimony is clearly contrary to this Court's prior ruling that the terms of the JVA were not in violation of the RFR. *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC 5 at 20 (No. 98 CVS 008571, Mecklenburg County Super. Ct. May 26, 1999) (Tennille, J.). Professor Donaldson's opinions on those issues are not only contrary to North Carolina law but also to the law of the case.

{35} This Court also questions Professor Donaldson's qualification as an expert in this case. There is no doubt that Professor Donaldson possesses specialized knowledge in the field of business ethics. Nevertheless, the Court is not convinced that Professor Donaldson is more qualified than the jury to review the evidence in this case and arrive at a conclusion about whether a secret agreement exists among defendants. Admitting Professor Donaldson's opinion invites the jury to simply defer to the expert. In essence, Plaintiff offers Professor Donaldson to testify that he has reviewed all the evidence in the case and concludes that a secret agreement exists. Subsumed in such a conclusion are judgments with respect to the credibility of witnesses - judgments quintessentially left to the trier of fact. This Court is troubled by this usurpation of the jury's function and province to determine credibility. Thus, based on the affidavit submitted by Professor Donaldson, the Court is convinced that he should not be permitted to testify as an expert on the ultimate issue in this case.

{36} In light of the Court's concerns regarding Professor Donaldson's methodology and qualifications,

the Court strikes the testimony of Professor Donaldson submitted in connection with Praxair's opposition to Defendants' Motion for Summary Judgment and has not considered his opinions in ruling on the motion for summary judgment.

**B.**

**Mr. William E. Barrett**

{37}     Praxair identified William E. Barrett, a certified corporate trust specialist, as a potential expert witness at trial; however, Mr. Barrett did not submit an affidavit in connection with Defendants' Motion for Summary Judgment.  Therefore, the Court will not make any rulings with respect to admissibility of Mr. Barrett's testimony, but instead will explain the framework in which the admissibility of Mr. Barrett's testimony at trial will be considered.  In Mr. Barrett's deposition, he concluded that, based on his consideration of Mr. Turner's estate plan at the time of the JVA, it is "highly likely" that the Turners will be compelled by economic incentives to redeem or exchange the NWS preferred shares sometime between the years 2006 and 2009.  (Barrett Dep. 42, 62-66.)  Defendants do not challenge Mr. Barrett's qualifications or the reliability of his testimony.   Instead, the Defendants argue that Mr. Barrett's testimony lacks relevancy.  According to Defendants, Mr. Barrett's opinion about what the Turners should or must do based on the economic incentives in the JVA is irrelevant to the question of whether the Turner's secretly agreed to redeem or exchange their preferred shares.

{38}     The Court believes that a financial expert's opinion about the economic considerations facing the preferred shareholders, while circumstantial, is relevant to the question of whether the Turners secretly agreed to exchange or redeem their preferred shares.  Evidence that the structure of the JVA creates incentives for the preferred shareholders to either exchange or redeem their shares is relevant to show what Airgas and the Turners intended and agreed upon.  Therefore, Mr. Barrett should be allowed to describe the economic incentives contained in the JVA and explain their significance.

{39}     However, Mr. Barrett may not testify as to the likelihood that the NWS preferred shareholders will exchange or redeem their shares.  Although Mr. Barrett may explain what a rational investor would do based on economic considerations, he may not draw a conclusion about the likelihood that the Tuners will act as rational investors.  He has no way of knowing what the decision maker at the time will actually do.  In addition, as discussed above, Mr. Barrett may not draw a legal conclusion for the jury; thus, he may not opine that defendants reached a secret agreement.  Therefore, there is a limit to the admissibility of Mr. Barrett's testimony.

## C.

## Dr. Stewart Myers

{40}    Similarly, Praxair offers the testimony of Dr. Stewart Myers, professor of finance and economics at MIT.  In his affidavit submitted by Praxair in opposition to Defendants' Motion for Summary Judgment, Dr. Myers describes in great detail the economics of the JVA.  Defendants do not challenge Dr. Myers' qualifications or the reliability of his methodology, but instead argue that Dr. Myers' testimony is irrelevant.  Praxair explains that Dr. Myers will testify about the fact that the financial incentives in the JVA "compel" redemption or exchange, thus rendering the other options in the JVA meaningless.  Praxair argues that evidence that the financial incentives render a particular result highly likely is relevant to the question of whether there was a separate agreement.

{41}    Dr. Myers describes the economics of the transaction between Airgas and NWS and attempts to value various aspects of the JVA.  Dr. Myers testified that the transaction between Airgas and NWS left Airgas the sole economic owner of NWS.  (Myers Aff. ¶ 9.)  Dr. Myers also testified that the options in the JVA are structured in such a way that the NWS preferred shareholders will incur "a drastic financial penalty if they keep the NWS Preferred beyond June 2009." (Myers Aff. ¶ 32.)  In his affidavit, Dr. Myers describes the NWS preferred stock and explains the basis for his opinion that the value of the NWS preferred shares depends on the option to redeem or exchange the shares.  (Myers Aff. ¶¶ 7-14, 15-18.)  Dr. Myers also explains the basis for his opinion that the voting rights attached to the NWS preferred stock do not add significant value to the shares. (Myers Aff. ¶¶ 34-40.)  Based on his analysis of the value of the preferred shares, Dr. Myers concludes that "[r]edemption or exchange of the Turners' NWS Preferred at some point in the window between July 2006 and the end of June 2009 is a foregone conclusion." (Myers Aff. ¶ 19.)

{42}    In accordance with the principles discussed above, Dr. Myers may testify to the financial incentives in the JVA and may describe the various economics of the transaction.   Dr. Myers' testimony may be helpful to the jury in reaching a complete understanding of the structure of the JVA and of how the transaction should be valued.  Such evidence is relevant to the question of whether the written terms of the JVA constitute the entire agreement or whether Defendants' entered a separate agreement for the exchange or redemption of the remaining NWS shares.  However, like Mr. Barrett, Dr. Myers cannot testify that there is a secret agreement among Defendants.  To allow such testimony would be to allow Dr. Myers to answer the question that is left for the jury. *See Williams v. Sapp*, 83 N.C. App. at 120, 349 S.E.2d at 306.

{43}    In addition, Dr. Myers may not opine what the NWS preferred shareholders will do.  Accordingly,

Dr. Myers may not testify that redemption or exchange is a foregone conclusion or that the JVA compels a given result. Such testimony would be contrary to the Court's May Order. In that Order, the Court held:

> The Joint Venture Agreement gives the Turners the choice of doing four things after July of 2006. First, they may exchange with National Welders their preferred shares for Airgas common shares. Second, they may redeem their preferred shares for cash from National Welders. Third, they may hold their preferred voting stock and collect a 5% dividend. Fourth, they could sell some or all of their shares if they could find a market for such a security. Each of these choices is a contract right.
>
> . . .
>
> The drafters of the Joint Venture Agreement were successful in avoiding triggering Praxair's rights under the RFR primarily because the agreement left Airgas at risk that whoever owned or controlled the Turner Family stock in 2006 could elect to retain ownership of the stock or sell it to someone else. Even though there were strong incentives built into the agreement for the Turners to exchange their National Welders stock for cash or Airgas stock after the RFR expired, the written agreement provided no guarantee that they would do so, and it left the Turner Family in the position of being able to chose its course of action based upon the circumstances in existence in the year 2006.

1999 NCBC 5, at 11, 20. Thus, the Court recognizes that there is a risk that is borne by Airgas as a result of the express terms of the JVA. To testify that "the probability that the Turners will either redeem or exchange their [shares] . . . is virtually 100%" (Pl. Resp. to Mt. in Limine at III.B.2) ignores the noneconomic considerations that may be important to the Turners. While Dr. Myers may testify as to the behavior of a rational investor to the economic considerations of exchanging or redeeming shares upon the expiration of the JVA and explain the financial incentives built into the JVA, it is ultimately for the jury to decide whether such incentives are indicative of a separate agreement that insures a given outcome.

{44} Thus, in connection with its decision on Defendants' motion for summary judgment, the Court will consider the testimony of Dr. Myers to the extent that it goes to the economics of the transaction and the financial incentives contained in the JVA. However, the Court has not considered opinion testimony that concludes that the NWS preferred shareholders will act in a given way.

## D.

### Dr. Joseph E. Johnson

{45} Defendants also challenge testimony of Dr. Joseph E. Johnson, professor of business and economics at the University of North Carolina at Greensboro. First, Defendants argue that Dr. Johnson is not qualified to testify as an expert. Defendants base this argument on a portion of Dr. Johnson's deposition testimony in which Johnson states that he is no more capable than the jury to draw the ultimate conclusion in this case. (Johnson Dep. 87.) However, in the same portion of

testimony, Dr. Johnson clarifies that his role is "not to draw the conclusion for the jury, it is to assist them in interpretation." (*Id.*) Dr. Johnson correctly states his role as an expert witness. He may not draw legal conclusions for the jury, but instead my offer testimony which will help the jury understand the underlying facts. The Court believes that Dr. Johnson's education and experience qualifies him to testify as an expert on the subjects of economics, finance and business transactions. Dr. Johnson has taught courses in these subject matters for over 35 years and is widely published in the areas of finance and economics. In addition, Dr. Johnson has testified as an expert on the subjects of business, economics and finance several times in the past. Dr. Johnson's education, training and experience qualifies him to provide expert testimony that will assist the jury in understanding the economic aspects of the transaction between Defendants.

{46}   Despite Dr. Johnson's qualifications, there are some problems with his testimony. Like Professor Myers, Dr. Johnson believes that the only viable option available to the NWS preferred shareholders is to exchange or redeem their stock. Again, Dr. Johnson may not testify that the JVA compels a given result. As already discussed, the Court has ruled that the JVA gives the NWS preferred shareholders four distinct options. To testify that the Turners have no choice under the JVA is contrary to the express terms of the agreement.

{47}    In opposition to Defendants' motion for summary judgment, Praxair offers the opinion of Dr. Johnson that "the Turners will redeem or exchange their NWS preferred stock between the years 2006 and 2009 . . . in part because the failure of the Turners to exercise either of the options to redeem or exchange would result in the Turners holding a security with dividends producing below market yields." (Pl. Br. Opp. S.J. citing Johnson Dep. at 173,75, 189, 246-53, 258.) While Dr. Johnson may explain the economics of the transaction and the economic consequences of the various options granted by the JVA, he may not testify as to what the Turners *will* do. Therefore, for purposes of ruling on the motion for summary judgment, the Court will strike the testimony of Dr. Johnson to the extent that it seeks to tell the Court what option the Turners *will* exercise.

{48}    In addition, Dr. Johnson may not testify that he is of the opinion that Defendants entered into a secret agreement. First, the Court does not believe Dr. Johnson is qualified to testify to the ultimate issue in this case. He has so stated. Second, the Court has some concerns about the reliability of Dr. Johnson's testimony. Dr. Johnson admits that he has no evidence of an explicit agreement, but that based on his review of the totality of the circumstances, he believes that there was an "unspoken," "unmemorialized" and "implicit understanding" among defendants. (Johnson Dep. II. at 289-92, 316.) The Court is unclear as to the methods that Dr. Johnson used to arrive at his conclusion; thus the

Court is unable to assess the reliability of his opinion. However, regardless of the reliability of Dr. Johnson's opinion, Dr. Johnson may not testify in a manner which urges the jury to reach a certain conclusion. *See Norris v. Zambito*, 135 N.C. App. at 292, 520 S.E.2d at 116. "Opinion testimony may be received regarding the underlying factual premise, which the fact finder must consider in determining the legal conclusion to be drawn therefrom, but may not be offered as to whether the legal conclusion *should* be drawn. *Id.* (citing *Raeford Farms*, 328 N.C. 578, 403 S.E.2d 483) (emphasis in original). Thus, as discussed above, Dr. Johnson may not draw the conclusion that Defendants entered into a separate agreement. Such a conclusion is for the jury alone to make.

## E.

## Mr. John Heyman

{49} Finally, Defendants seek to exclude the testimony of certified public accountant John Heyman. Defendants do not challenge Mr. Heyman's qualifications or the reliability of his methodology. Instead, Defendants argue that Mr. Heyman's opinions are irrelevant and wrong.

{50} Mr. Heyman submitted an affidavit in connection with Praxair's opposition to Defendants' Motion for Summary Judgment. In his affidavit, Mr. Heyman states that the purpose of his testimony is to explain accounting and financial reporting principles and practices that apply to the transaction between Airgas and NWS. Mr. Heyman describes how accountants determine, under generally accepted accounting principles (GAAP), when to consolidate the financial statements of two different companies for reporting purposes. Mr. Heyman explains that the decision to consolidate must be based on a determination that one entity holds a controlling financial interest in another entity. Mr. Heyman further explains what qualifies as a controlling financial interest.

{51} According to the testimony of Mr. Heyman, if one company owns a controlling financial interest in another company, GAAP requires the controlling company to consolidate the controlled company's financial statements into the controlling company's statements unless an exception applies. One such exception is "temporary control." On its face the JVA does not create a controlling interest. The temporary control exception only arises if it is first determined that one company does in fact control the other company. (Heyman Aff. ¶ 15.) Mr. Heyman testifies that although Airgas and its accountants at KPMG determined that Airgas had a controlling financial interest in NWS, they concluded that the control over NWS "may be only temporary due to the litigation initiated by Praxair." (Heyman Aff. ¶ 13, Ex. G.) Mr. Heyman explains that Airgas did not consolidate NWS financial statements only because of the temporary control exception, as opposed to the express terms the JVA agreement. Furthermore, Mr. Heyman concludes that KPMG's analysis and treatment of

other accounting issues indicate that Airgas acquired a controlling financial interest in NWS.

{52}   Mr. Heyman reviewed the JVA, accounting documents, and the testimony of Alan DeMart, Chief Financial Officer of NWS. This review led Mr. Heyman to the conclusion that Airgas and NWS "possessed an effective understanding of a 'controlling financial interest' under GAAP." (Heyman Aff. ¶¶ 9, 10.)

{53}   In simplest terms, Mr. Heyman is offered as an accounting expert to testify that in his opinion:

1.   Generally accepted accounting principles (GAAP) determine when an entity should be consolidated with another entity based upon the first having a controlling financial interest in the second.

2.   Under GAAP, the JVA did not create a controlling financial interest in NWS by Airgas.

3.   Based on his review of the work papers, KPMG, - Airgas outside accountants - concluded that Airgas did have a controlling financial interest, but that it would not consolidate the financial statements because the litigation with Praxair rendered the control "temporary" under GAAP.

4.   Therefore, KPMG must have relied on terms, agreements or conditions to the Airgas/NWS transaction outside the JVA to conclude that Airgas had a controlling financial interest in NWS.

{54}   KPMG accountants deny knowledge of any separate agreement to complete the acquisition of NWS by Airgas and deny basing their accounting determination on the knowledge or existence of any separate agreement.

{55}   Mr. Heyman may testify that, in his opinion, the terms of the JVA do not support a determination that Airgas acquired a controlling financial interest in NWS. However, Mr. Heyman cannot testify that he is of the opinion a separate agreement existed. He is not qualified to render that opinion and the jury will determine the credibility of the witness and draw its own inferences from the evidence. Mr. Heyman's testimony creates an issue of fact which may be rebutted by testimony from the KPMG accountants and/or others. Like the other proffered experts, he may not express an opinion on the ultimate issue to be decided by the jury in this case, but may provide testimony with respect to underlying financial premises.

**F.**

**Conclusion as to Admission of Expert Testimony**

{56}   In conclusion, the Court has decided to exclude some of the expert testimony offered by Praxair from consideration in connection with Defendants' motion for summary judgment. The Court has decided to strike the testimony of Professor Donaldson on the grounds that Professor Donaldson's

methodology is unreliable. In addition, the Court has decided to consider the testimony of Mr. Barrett, Dr. Myers and Dr. Johnson to the extent that they seek to testify about the economics of the transaction among Defendants or the financial incentives built into the JVA. However, the Court will not consider testimony that concludes that the JVA compels any given result, nor will the Court accept the opinions of Praxair's experts that a separate agreement was in fact reached between Defendants. Finally, the Court will consider Mr. Heyman's opinions about the significance of Airgas' decision not to consolidate based on the "temporary control" exception. At trial, an expert's testimony will be admitted only upon a showing that the expert is qualified, that his testimony is relevant and that his methodology is reliable. While the Court has discussed the standards it will apply with respect to the testimony of experts, it will consider at trial whether the proffered expert testimony satisfies these admissibility requirements.

## IV.

### Motion for Summary Judgment

{57}     Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. *See* N.C. R. Civ. P. 56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995) (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact"). As moving parties, Defendants have "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26; *see also Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993). In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor." *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999); *see also Murray v. Nationwide Mut. Ins. Co.,* 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996).

{58}     To grant summary judgment, the court must conclude that no reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a motion for summary judgment, the judge must determine whether a fair-minded jury could return a verdict for the

non-movant on the evidence presented. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *10 (4th Cir. Sept. 7, 1999) (quoting *Anderson*, 477 U.S. at 252).

## A.

### Factual Evidence

{59}     The Court has reviewed the evidence submitted by the parties in connection with the motion for summary judgment and has concluded that summary judgment should not be granted. There are three bases for the Court's decision to deny the motion for summary judgment. First, the Court questions whether summary judgment is appropriate where the primary issue to be decided is so fact intensive. The question of whether a secret agreement exists between Airgas and the Turners is fact-intensive inquiry. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414-15 (4th Cir. 1979); *Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1235-36 (4th Cir. 1995); and *Charbonnages*, 597 F.2d at 414-14; 10B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure: Civil 3d* § 2730 at 7 (1998) (summary judgment is generally inappropriate in actions where state of mind is at issue because "someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ – a function traditionally left to the jury . . . ."). Here the issue presented necessarily involves presentation of circumstantial evidence to prove a fact denied by parties in sole possession of the direct evidence.

{60}     The third basis for denying summary judgment is that the Court cannot say with confidence that no reasonable jury could find in favor of Praxair. The evidence presented to the Court raises several issues of fact. Praxair presents evidence that, when taken in the light most favorable to Praxair, sheds doubt upon the legitimacy of the JVA and infers that Defendants entered into a separate, secret agreement for the sale of 100 percent of NWS to Airgas. For example, Praxair presents evidence that NWS sought to sell 100 percent of the company, both when it was in negotiations with Praxair and later when it entered into negotiations with Airgas. Defendants dispute this argument; however, Defendants' position only indicates that there are issues of fact to be decided by the jury. Additionally, Praxair offers evidence, including the valuation of an investment banking firm retained by NWS, that the Turners received from Airgas 100 percent of the economic value of NWS in 1996 instead of the 47 percent ostensibly purchased as expressed in the JVA agreement. This evidence, when taken in the light most favorable to Praxair, supports the argument that the JVA, which on its face did not provide for the complete transfer of NWS to Airgas, did not embody the complete agreement between Defendants, but instead Defendants entered into a separate agreement for the complete transfer of

NWS to Airgas.

{61}      Praxair also offers evidence that the JVA has no legitimate business purpose, supporting the allegation that the JVA is a sham.  First, Praxair argues that Airgas shares none of the profits or losses of the JVA with NWS, which is contrary to North Carolina case law, which provides that "an agreement for the sharing of profits is essential to creation of a joint venture." *Rockingham Square Shopping Center, Inc. v. Integon Life Ins. Corp.*, 52 N.C. App. 633, 646, 279 S.E.2d 918, 926 (1981).  Second, Praxair presents evidence that operating synergies were not created by the JVA despite the parties' contention that they are "partners."  Third, Praxair presents evidence that Mr. Turner was forced out of NWS, contradicting Mr. Turner's testimony that he remained in control of NWS.  Finally, Praxair presents evidence that Airgas is treating NWS not as a joint venture partner, but as any other company it has acquired.  Defendants present counter-evidence to dispute the argument that the JVA is a sham.  Again, at this juncture the Court's role is not to weigh the evidence, but instead to determine whether questions of fact exist.  Here, the opposing evidence presented by the parties clearly reveals genuine issues of material facts.

{62}      Praxair also presents a significant amount of evidence concerning the economic incentives built into the JVA.  According to Praxair's experts a rational investor would either exchange or redeem his shares upon the expiration of the JVA based on these incentives.  Praxair argues the JVA, with its financial incentives all point to one result, and is evidence that Defendants entered into an agreement outside of the JVA.  Defendants argue that such evidence ignores noneconomic considerations important to the Turners.  While this may be so, jurors are entitled to consider the evidence of economic incentives in light of these noneconomic considerations and decide for themselves whether the economic structure of the JVA is indicative of a separate agreement.

{63}      The parties also disagree about the value, if any, of the preferred shareholder rights that continue after the JVA expires.  Defendants attach significance to these rights, arguing that the preferred shareholders have a right to "hold" their preferred stock, and that with such right attaches the possibility that shareholders can demand a higher dividend.  Thus, according to Defendants, the hold option retained will be more valuable than the option to redeem or exchange.  Praxair takes issue with this purported "hold option," arguing that (1) under corporate law, in the absence of an agreement to the contrary, the 5 percent dividend attached to the preferred stock is fixed; (2) Airgas rejected NWS' shareholders' request to receive participating stock; and (3) the argument that the preferred shareholders could force an increased dividend ignores their fiduciary duties to act in the best interests of NWS and all of its stockholders.  Again, this dispute about the evidence supports the Court's

determination that genuine issues of material fact exist, and that summary judgment is inappropriate.

{64}    Finally, Praxair offers evidence that Airgas' accountants and bankers viewed the transaction between Defendants as one involving the complete transfer of NWS to Airgas. Specifically, Praxair argues that, based on the information provided about the transaction, Airgas' accountants treated the transaction as an acquisition of NWS and Airgas' lenders understood that Airgas was acquiring NWS. Praxair further argues that Airgas' bankers concluded, based on information provided by Airgas and NWS, that the transaction between Defendants was one for the acquisition of NWS, and that the mechanism of a joint venture was simply a means to avoid triggering the RFR. Praxair points to documents and deposition testimony supporting the argument that bankers privy to information about the transaction all interpreted the transaction as an acquisition.

{65}    In further support of its claim, Praxair submits evidence that Airgas' accountants determined that Airgas acquired a controlling financial interest in NWS; Airgas was required to consolidate NWS' financial results into Airgas' financial statements unless a limited exception applied; such an exception did apply; and, the exception could only apply after a determination that Airgas had a controlling financial interest in NWS. This determination may be further evidence that Airgas' accountants treated the transaction as an acquisition. Additionally, Praxair offers expert testimony that the determination that Airgas had a controlling financial interest was not supported by the terms of the JVA. Praxair argues that the fact that the accountants' analysis was not supported by the JVA evidences an agreement outside of the JVA.

{66}    Defendants take the position that Rule 602 of the North Carolina Rules of Evidence renders any testimony by outside accountants or bankers characterizing the deal as an acquisition inadmissible. Rule 602 provides that a witness may not testify to a matter unless his testimony is based upon personal knowledge. According to Defendants, the only witnesses whose testimony about the transaction may be considered are those who actually participated in the transaction. The Court rejects this argument as a blanket rule in this case. Certainly, an individual may have personal knowledge about the facts of a transaction based on information he is provided from those involved in negotiating the deal. *See* Corbin on Contracts (rev. ed.) § 4.12 at 629 n.3 (the understandings of third persons "can be good circumstantial evidence of what the understandings of the parties might be or reasonably should be.") To find otherwise forces the jury to accept the testimony of the parties to the transaction without allowing them to consider third parties' view of the transaction based on information they obtained from the participating parties. If the testimony of these accountants and bankers is based on personal knowledge, it reflects directly what those persons learned by reason of their personal

participation in some aspect of the transaction. Those decisions will be made at trial based on the source of knowledge of the speaker and whether or not the speaker's conclusions were merely assumptions.

## B.

### Circumstantial Evidence

{67}     While the above discussion reveals several issues of fact, more issues of fact arise on circumstantial evidence submitted to the Court. The circumstantial evidence, when taken as a whole and viewed in the light most favorable to Praxair, could support a jury decision that Defendants entered into an agreement outside of the JVA for the sale of NWS to Airgas. It would be inappropriate to grant summary judgment to Defendants under these circumstances.

{68}     Praxair argues that it is entitled to an inference that the documents allegedly destroyed by Defendants contained evidence of a secret agreement between Airgas and National Welders, and that summary judgment should not be granted on these grounds. Praxair relies on the spoliation of evidence rule, which provides that the intentional destruction of evidence may give rise to an inference that the destroyed evidence was harmful to the destroyer. *See Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*, NO. COA 99-597 (N.C. Ct. App. May 16, 2000); *McClain v. Taco Bell Corp.*, No. COA 98-750 (N.C. Ct. App. Apr. 4, 2000.); *Yarborough v. Hughes*, 139 N.C. 199, 209, 51 S.E. 904, 907-08 (1905); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). Specifically, "where a party fails to introduce in evidence documents that are relevant to the matter in question and within his control . . . there is a presumption or at least an inference that the evidence withheld, if forthcoming, would injure his case." *Yarborough*, 139 N.C. at 209, 51 S.E.2d at 907-08. This rule of evidence is based on the common sense notion that individuals do not normally withhold or destroy evidence useful to their case. *See Kronisch*, 150 F.3d at 126. The inference serves to restore the prejudiced party to the same position he would have been in had the destruction of relevant documents not occurred. *See id.*

{69}     The standard for applying the spoliation inference is evidence that the party intentionally destroyed potentially relevant materials while aware of the possibility of future litigation. *See McClain*, slip op. at 13-14. Whether materials were intentionally destroyed depends on the awareness of the party in possession of the documents. Therefore, a party is entitled to the spoliation inference, if he shows that the party having control over the evidence had an obligation to preserve it at the time it was destroyed. *See* 150 F.3d at 126. Such an obligation arises when the party in possession of the evidence is on notice that the evidence may be relevant to future litigation. *See id.* Thus, where the

party was "aware of circumstances that were likely to give rise to future litigation" but nevertheless destroyed potentially relevant documents, the jury may draw an adverse inference against such party. *McClain*, slip op. at 14. A showing of such awareness satisfies the requirement that the evidence was intentionally destroyed; bad faith or even awareness of impending trial need not be shown. *Id.* at 8-9.

{70}    Furthermore, "the prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Kronisch*, 150 F.3d at 128. Stated simply, the material destroyed must be potentially relevant to the issues presented at trial. *See id.* To ascertain relevancy, the party seeking the spoliation inference must show that "there is [a] likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." *See id* at 127. Therefore, while it is often difficult to ascertain the relevancy of the materials destroyed, evidence identifying the types of documents destroyed may provide the court with sufficient information to make the relevancy determination.

### B. 1.

### Awareness of Pending Litigation

{71}    The record contains evidence that Airgas and NWS intentionally destroyed relevant documents at a time when they fully anticipated litigation with Praxair. For example, Praxair has presented evidence of at least two letters serving to put Airgas and NWS on notice of the potential for future litigation with Praxair. First, as early as 1995, Bill Lichtenberger, CEO of Praxair, sent a letter to Peter McCausland, CEO of Airgas, notifying McCausland that Praxair would not tolerate Airgas' interference with its rights under the RFR with NWS. Later, on July 2, 1996, just a few days after the execution of the JVA, Praxair attorney Bill McClure sent a letter to NWS attorney Mark Bernstein reminding Bernstein of Praxair's rights under the RFR and requesting copies of documents relating to the JVA transaction. Despite these letters, in July 1996, NWS individuals who were central to the negotiations between NWS and Airgas met and ultimately decided to gather documents relating to the JVA, including drafts and handwritten notes, and take them to Bill Boone (General Counsel for NWS) for destruction. In addition, there is evidence that, following the execution of the JVA, Bob Young, an attorney for Airgas and a participant in the negotiations, destroyed his files, also containing drafts and notes taken during negotiations.

{72}    Aside from the letters mentioned above, Defendants have essentially admitted that they anticipated litigation even prior to the execution of the JVA. Defendants asserted the work product

doctrine as a basis for withholding documents from Praxair and instructed witnesses not to answer deposition questions relating to conversations prior to June 28, 1996 on the basis that such conversations were held in anticipation of litigation and are protected by the attorney work product doctrine. Evidence and common sense shows Defendants were fully aware of and anticipated the potential for litigation with Praxair. Nevertheless, Defendants admittedly destroyed documentation related to the negotiations surrounding and the execution of the JVA.

## B. 2.

## Relevancy of Destroyed Documents

{73}    According to the testimony of many NWS and Airgas witnesses, the documents destroyed included drafts of the JVA, handwritten notes, correspondence, memos, and even entire files associated with the transaction. There is no question that documents destroyed by Airgas were relevant to this litigation. The central issue involves determining if the JVA reflects the entire agreement among Defendants. Certainly drafts of the agreement between Defendants and handwritten notes of the negotiations have some bearing on the question of whether the Defendants entered into an agreement not embodied by the written terms of the JVA. The fact that files relating to the JVA were destroyed satisfies the relevancy requirement of the spoliation inference.

{74}    Praxair's evidence of spoliation is such that the strength of Praxair's allegation weighs against granting summary judgment in favor of Defendants. Although the destruction of evidence, standing alone, is insufficient to allow a party producing such evidence to support a summary judgment claim, such destruction "may push a claim that might not otherwise survive summary judgment over the line." *Kronisch*, 150 F.3d at 128. In the words of the Second Circuit:

> [The Court] believe[s] that plaintiff has produced enough circumstantial evidence to support the inference that the destroyed [] files may have contained documents supporting (or potentially proving) [its] claim, and that the possibility that a jury would choose to draw such an inference, combined with the plaintiff's circumstantial evidence, is enough to entitle plaintiff to a jury trial.

*Id.* Praxair has produced sufficient circumstantial evidence in support of its argument that Defendants destroyed potentially relevant documents. In addition, as discussed above, Praxair presented sufficient circumstantial evidence to raise issues of fact. While "the [spoliation] inference does not supply the place of evidence of material fact, and does not shift the burden of proof so as to relieve the party upon whom it rests of the necessity of establishing a prima facie case," the inference, together with Praxair's circumstantial evidence, provides a sufficient basis for denying summary judgment. *McLain*, slip op. at 8 (quoting *Doty v. Wheeler*, 182 A. 468, 471 (Conn. 1936).

# V.

## Conclusion

{75}     The motion in limine was premature and this Court substituted, in its place, a motion to strike certain evidence submitted by Praxair in opposition to the motion for summary judgment.  The Court evaluated the expert testimony submitted by Praxair in light of the requirements for admissibility of such testimony:  qualification, relevance, and reliability.  In conjunction with this review, the Court identified several factors helpful in assessing the reliability of the nonscientific expert testimony offered by Praxair.  At trial, the Court must be satisfied not only that any expert is qualified and his testimony is relevant, but also that his methodology is reliable based on these factors.

{76}     The Court decided to exclude some of Praxair's proffered expert testimony from its consideration of the motion for summary judgment.  Specifically, the Court strikes all of Mr. Donaldson's testimony based on a determination that Mr. Donaldson is unqualified to render an opinion on the ultimate issue, nor is his methodology reliable.  In addition, the Court considered testimony regarding the economics of and the financial incentives in the JVA given by Dr. Myers and Dr. Johnson.   Likewise, the Court considered the testimony of Mr. Heyman that sought to explain the accounting principles relevant to the decision not to consolidate the companies' financials, and the significance of this decision in light of the terms of the JVA.  However, the Court did not consider any expert testimony that concluded a given result would in fact occur or that a separate agreement was in fact reached.

{77}     After considering the testimony of Praxair's witnesses, the evidence of record and the briefs and oral arguments of counsel, the Court determines that summary judgment is inappropriate.  Airgas and National Welders Supply make strong arguments that the parties to the JVA and their supporting cast of accountants, lawyers, investment bankers and others - all having excellent reputations in their communities - did not and would not participate in such a massive fraud.  Mr. Turner, Mrs. Carpenter, Mr. McCausland and Airgas vehemently deny such an agreement existed.   Defendants may well convince a jury that;  1) the Turners need not make a decision about the stock until after the RFR expired; 2) the Turners might voluntarily make an economically irrational decision, or; 3) the Turners are able to renegotiate the deal.  On the other hand, Praxair may convince a jury that; 1) the Turners wanted to sell the company; 2) they wanted to sell it to Airgas; 3) they structured a deal which on paper did not trigger Praxair's rights under the RFR;  4) the Turners got 100 percent of the value of their stock when the JVA was signed; 5) Mr. McCausland , Mr. Turner and Mrs. Carpenter met alone and agreed that when the time came to make the decision under the JVA, the Turner family would elect either to cash out or exchange their preferred stock for Airgas stock,  and; 6) Praxair may prove

that no rational investor would make a different decision.  There are strong arguments made on both sides.  Summary judgment may not be entered under these circumstances.

{78}

Therefore, it is hereby **ORDERED, ADJUDGED** and **DECREED** that:

1.  Defendants' motion in limine is treated as a motion to strike and is granted in part and denied in part; and

2.  Defendants' motion for summary judgment is denied.


This the 14th day of August, 2000.


The Honorable Ben F. Tennille
Special Superior Court Judge
For Complex Business Cases