Clark v. Alan Vester Auto Group, Inc., 2009 NCBC 18.

STATE OF NORTH CAROLINA

COUNTY OF VANCE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 1411

JOHN CLARK and MARY CARMON,
Individually and on Behalf of
a Class of All Those Similarly Situated,
                     Plaintiffs

v.

ALAN VESTER AUTO GROUP, INC., d/b/a
ALAN VESTER AUTO SALES, d/b/a ALAN
VESTER AUTO OUTLET OF ROXBORO,
d/b/a ALAN VESTER MITSUBISHI, and
d/b/a ALAN VESTER AUTO MART OF
KINSTON, INC.; ALAN VESTER MOTOR
COMPANY, INC., d/b/a ALAN VESTER
HONDA; ALAN VESTER NISSAN, INC.,
d/b/a ALAN VESTER AUTOMOTIVE OF
GREENVILLE; ALAN VESTER AUTO
MART, INC.; ALAN VESTER FORD
LINCOLN MERCURY, INC., d/b/a ALAN
VESTER AUTO OUTLET; ALAN VESTER
AUTO MART OF KINSTON, INC.; ALAN
VESTER MANAGEMENT CORPORATION;
ALAN VESTER ENTERPRISES, LLC, d/b/a
ALAN VESTER AUTO MART OF SELMA;
UNIVERSAL UNDERWRITERS
INSURANCE COMPANY AND WESTERN
SURETY COMPANY,
                     Defendants

**ORDER ON MOTION FOR
DISCOVERY SANCTIONS**

This Vance County civil action was designated exceptional and assigned

to the undersigned by Order of the Chief Justice of the North Carolina Supreme

Court, pursuant to Rule 2.1 of the General Rules of Practice for the Superior and

District Courts.  It is before the court, among other things, for determination of

Plaintiffs' Motion for Discovery and Spoliation Sanctions, filed August 18, 2008

(the "Motion"). For the reasons stated in this Order, the court concludes that the

Motion should be GRANTED in part and DENIED in part.

> *Wallace and Graham, PA by Mona Lisa Wallace, Esq.; John Hughes, Esq. and Mike Pross, Esq.; Lyons & Farrar, PA by Douglas S. Lyons, Esq.; and Hopper, Hicks & Wrenn, LLP by James C. Wrenn, Esq. for Plaintiffs John Clark and Mary Carmon, individually and on behalf of a class of all those similarly situated.*

> *Teague, Rotenstreich, Stanaland, Fox & Holt, PLLC by Kenneth Rotenstreich, Esq.; Lyn K. Broom, Esq. and Paul A. Daniels, Esq. for Defendants Alan Vester Auto Group, Inc. d/b/a Alan Vester Auto Sales, d/b/a Alan Vester Auto Outlet of Roxboro, d/b/a Alan Vester Mitsubishi, and d/b/a Alan Vester Auto Mart of Kinston, Inc.; Alan Vester Motor Company, Inc., d/b/a Alan Vester Honda; Alan Vester Nissan, Inc., d/b/a Alan Vester Automotive of Greenville; Alan Vester Auto Mart, Inc.; Alan Vester Ford Lincoln Mercury, Inc., d/b/a/ Alan Vester Auto Outlet; Alan Vester Auto Mart of Kinston, Inc.; Alan Vester Management Corporation; Alan Vester Enterprises, LLC, d/b/a Alan Vester Auto Mart of Selma; Universal Underwriters Insurance Company and Western Surety Company.*

Jolly, Judge.

THE COURT, having considered the Motion, the submissions and briefs of

the parties in support of and opposition to the Motion, arguments of counsel,

appropriate matters of record, and the ends of justice, FINDS, only for the

purposes of the Motion, that:

I.

PROCEDURAL BACKGROUND

[1]     On February 7, 2006, Plaintiffs John Clark ("Clark)" and Servietta

Hameed ("Hameed") filed their Complaint on behalf of themselves and all others

similarly situated.

[2]     On April 7, 2006, Plaintiffs filed a First Amended Complaint.

[3]     On August 29, 2006, by Order of the court, Plaintiffs' Second Amended Complaint was deemed filed.  In material part, the Second Amended Complaint added Mary Carmon ("Carmon") as a party Plaintiff.

[4]     On September 25, 2006, Defendants filed their Answer to the Second Amended Complaint.

[5]     On October 17, 2006, Plaintiff Hameed dismissed her claims, leaving Clark and Carmon as the remaining named Plaintiffs.

[6]     On October 17, 2006, Plaintiffs moved for leave to file a Third Amended Complaint in material part seeking to join Universal Underwriters Insurance Company ("Universal Underwriters") and Western Surety Company ("Western Surety") as Defendants.

[7]     On February 7, 2007, the court entered a Case Management Order in material part granting the Plaintiffs' motion to amend and deeming the Third Amended Complaint filed as of that date (unless otherwise indicated, the Third Amended Complaint will be referred to in this Order as the "Complaint").

[8]     On February 27, 2007, Defendants filed their Answer to the Complaint.

[9]     On August 18, 2008, Plaintiffs Clark and Carmon filed the Motion.

[10]    On November 12, 2008, the court heard oral argument on the Motion.  The court took the Motion under advisement.

II.

THE PARTIES

[11]    Plaintiffs Clark and Carmon are citizens and residents of North

Carolina.

[12]    The Complaint names as Defendants the following corporate

entities alleged to be organized and authorized to conduct business under the

laws of the State of North Carolina:

(a)    Alan Vester Auto Group, Inc., d/b/a Alan Vester Auto Sales,

d/b/a Alan Vester Auto Outlet of Roxboro and d/b/a Alan Vester

Mitsubishi;

(b)    Alan Vester Motor Company, Inc., d/b/a Alan Vester Honda;

(c)    Alan Vester Nissan, Inc., d/b/a Alan Vester Automotive of

Greenville;

(d)    Alan Vester Auto Mart, Inc.;

(e)    Alan Vester Ford Lincoln Mercury, Inc., d/b/a Alan Vester

Auto Outlet;

(f)    Alan Vester Auto Mart of Kinston, Inc. (the "Kinston

Dealership");[1]

---

[1] On January 11, 2008, Defendants filed a Chapter 7 Petition of Bankruptcy for the Kinston Dealership.  This triggered an automatic stay under the Bankruptcy Act.  Plaintiffs have not dismissed their claims against the Kinston Dealership, but have not further litigated them either, in light of the stay.  While the claim against the Kinston Dealership is stayed by the bankruptcy proceeding, it is the Plaintiffs' contention that the claim against the sureties on the bond is viable since under the Dealer Act a consumer may sue "either the principal, the surety, or both," *Bernard v. Ohio Cas. Ins. Co.*, 79 N.C. App. 306, 310 (1986), and the purpose of the Act is to allow consumers recourse where dealers have gone out of business. The Vester dealerships had surety bonds chiefly through Universal Underwriters, a large surety and insurance carrier for car dealers.  While Plaintiffs do not seek to certify a class that would recover against the Kinston

      (g)     Alan Vester Management Corporation; and

      (h)     Alan Vester Enterprises, LLC, d/b/a Alan Vester Auto Mart of

Selma (collectively all of the above Defendant entities may be referred to in this Order as "Vester" or the "Vester Defendants," depending on context).

[13] Among other things, the Vester Defendants are in the retail business of selling automobiles to the public.

[14] Defendant Universal Underwriters is a corporation duly organized and authorized to conduct business under the laws of the State of Kansas.

[15] Defendant Western Surety is a corporation duly organized and authorized to conduct business under the laws of the State of South Dakota.

### III.

### THE UNDERLYING CLAIMS

[16] <u>Clark</u>. By his Claim, Plaintiff Clark seeks to recover damages for alleged violation by one or more of the Vester Defendants of the Motor Vehicle Dealers and Manufacturers Licensing Law, N.C. Gen. Stat. § 20-285, *et seq.* (the "Dealer Act") (henceforth in this Order, references to the North Carolina General Statutes will be to "G.S.") and the Unfair and Deceptive Trade Practices Act, G.S. 75-1.1, *et seq.* ("Chapter 75") (collectively Clark's "Claims" or the "Down Payment Claims").

---

Dealership, Plaintiffs contend that Universal Underwriters, as surety for that dealership, would stand in its stead should there be a recovery as to the Kinston dealership.

[17]    Carmon.  By her Claim, Plaintiff Carmon seeks to recover damages for alleged violation by one or more of the Vester Defendants of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (the "FCRA Claim").

[18]    By separate Order of even date herewith, the court has granted Defendants' Motion for Summary Judgment with regard to Carmon's FCRA Claim.  Accordingly, Carmon's FCRA Claim has been dismissed and further discussion of it in this Order is not necessary.  Consequently, the court will only address the Motion in the context of the Clark Claim.

IV.

THE MOTION

[19]    Plaintiff Clark seeks an order imposing various sanctions upon the Vester Defendants for alleged document destruction and discovery abuse.  As sanctions, Plaintiff asks that:

(a)    The Vester Defendants be declared guilty of spoliation of evidence, for which Plaintiff seek the imposition of certain negative inferences upon the Vester Defendants relative to certain of the Plaintiffs' respective claims in this putative class action;

(b)    The Vester Defendants' Answer in this civil action be stricken, pursuant to Rule 37, North Carolina Rules of Civil Procedure "(Rule(s)"); and

(c)    Plaintiff be awarded fees and expenses incurred as a result of Defendants' actions, pursuant to Rule 37.

V.

THE FACTS

[20]    At times material in 2003, Plaintiff Clark purchased a used Mitsubishi automobile from Alan Vester Enterprises, LLC, d/b/a Alan Vester Auto Mart of Selma. The sales contract reflects a purported cash down payment of $2,000.  Clark testified he made no down payment.

[21]    A central contention in Clark's Claim against the Vester Defendants is that Vester regularly marketed vehicles as "no money down" and inaccurately represented in contract documents that cash down payments were made when they were not.  Clark contends that as a matter of practice, the Vester Defendants regularly used the false down payment mechanism with customers, and documented those false down payments as "CFA" or "Customer Funding Assistance" ("CFA") on internal accounting documents known as "cover sheets" ("Cover Sheets") that were prepared by Vester for each automobile sales transaction.  Clark further contends the purpose of the Cover Sheets was to allow Vester to keep track of its use of falsified down payments; and that the false down payments were used to increase the likelihood that subprime loans would be funded and to obtain approvals for higher loan amounts from lenders; and that the Cover Sheets were kept secret and not shown to the consumer or the lender. Defendants have conceded that a CFA entry can mean "a down [payment] that the customer didn't make."[2]  Clark also contends that the Vester dealerships accounted for down payments in one of two ways: (a) if a customer made a down

---

[2] Rodney Vester Dep., p. 174.

payment, it would provide the customer with a receipt; and (b) it would record internally on a Cover Sheet whether the down payment was real or falsified.

[22] The cover sheets were critical evidence of false down payments in the Vester Defendants' possession.

[23] As a basis for his Motion, Clark contends that Vester officers, agents and employees, with knowledge that the Cover Sheets were material to civil claims against the Vester Defendants based on allegedly false down payments, knowingly followed an improper practice of destroying incriminating Cover Sheets and otherwise resisting and obstructing the discovery process during the course of discovery in this matter.

[24] In Clark's vehicle sales file (a "Deal File"), the bill of sale indicates a down payment of $2,000 was made. However, there is no cash receipt, which is consistent with Clark's testimony that he did not pay $2,000 down. There is no Cover Sheet in Clark's Deal File.

[25] Defendant Alan Vester Auto Group, Inc. was previously sued in a case styled as *Glass v. Alan Vester Auto Group, Inc.*, Civ. No. 4-CV-77, filed on October 14, 2004, in the United States District Court for the Western District of Virginia. The Complaint alleged *inter alia* that "Vester falsely represented to Credit Union One that Glass made a $1,000 down payment . . ."[3] Defendant Alan Vester Auto Group, Inc. filed a "Defendant's Identification of Witnesses" dated June 9, 2005, listing *inter alia* Alan Vester as a witness. The lawsuit was subsequently settled and dismissed on July 27, 2005. Defendants do not dispute

---

[3] *Glass* Compl., ¶ 28.

that Alan Vester Auto Group, Inc. was properly served with the summons and complaint and in fact filed an answer in *Glass*, and filed discovery responses.

[26]    In early 2004, the lender Drive Financial wrote to Alan Vester Auto Sales of Burlington and Alan Vester Auto Mart of Kinston demanding repurchase of contracts due to asserted illusory down payments on three occasions. Defendants do not deny the receipt of these notices.

[27]    In a consumer complaint to the North Carolina Attorney General dated December 14, 2005, complainant Wendy Williams stated that after purchasing a vehicle in 2004 from Alan Vester Automotive of Greenville, she went personally to the dealership about six months later and expressed her concerns about the down payment issue, and stated that she thought it was an illegal act."[4]

[28]    Vester's outside accountant, Ralph Moore ("Moore"), testified by deposition that down payments should be documented and records should be kept three years under IRS guidelines.[5]  Moore advised Vester to keep records three years and testified that at least by 2002 he would have told Kristin Martin and Alan Vester to keep the documents three years.[6]  Vester never informed Moore about the use of CFA or the destruction of Cover Sheets.[7]

[29]    Vester's president, Alan Vester, received a complaint from one of Vester's lenders in September 2003 about, *inter alia*, the use of false down payments, as reflected by an internal Vester memo sent to all stores in

---

[4] Pls.' Br. Supp. Mot. Discovery Sanctions, Ex. 45.
[5] Moore Dep., pp. 18-20.
[6] *Id.* at 112-13, 117-19, 140-41, 161.
[7] *Id.* at 130-34.

September 2003 warning managers that the lender "will continue to check every deal" including for "down payment."[8]

[30]    In *Amelia Jefferson v. Alan Vester Auto Group et al.,* Civ. No. 05-CVS 1288 (Franklin County Superior Court), filed prior to the instant case, the plaintiff attached an example of a CFA form to her complaint.[9]

[31]    The instant case was then filed on February 7, 2006, alleging a scheme by Vester to use fake down payments documented internally by Cover Sheets not shown to the customer or the lender.

[32]    This court ordered the parties to maintain potentially relevant evidence in its February 2007 Case Management Order ("CMO").  With regard to documentary evidence, the CMO provided that "the parties agree to retain and not destroy potentially relevant documents falling within the scope of their respective written discovery requests."[10]

[33]    Plaintiffs served discovery seeking, among other things, production of the Cover Sheets on March 20, 2007.

[34]    When Defendants refused to provide the discovery, Plaintiffs filed a motion to compel dated June 21, 2007.  This motion to compel was heard on July 16, 2007 before this court.  Rodney Vester attended the hearing as a Defendant representative along with defense counsel.   At the hearing, the court directed Defendants to produce to Plaintiffs whatever Defendants possessed relative to down payments, customer funding assistance, CFA arrangements or rebates.

---

[8] Bewick Dep., Ex. 3.
[9] The *Jefferson* case was subsequently sent to arbitration because Vester produced evidence that Ms. Jefferson had signed an arbitration clause.
[10] CMO, Feb. 7, 2007, p. 5.

As to such production, the court further ordered that "If [Defendants] have none of those except down payments, make that representation, give [Plaintiffs] what you have in terms of down payments and then we'll go from there."[11]

[35]    On July 20, 2007, this court entered an order requiring Vester to produce, among other things, "accounting or bookkeeping records which account for down payments, customer funding assistance, CFA arrangements, or dealer rebates," and "deal files for inspection and random sampling."

[36]    On July 23, 2007, Plaintiffs took the Rule 30(b)(6) deposition of the Vester Defendants, who produced Rodney Vester as the corporate representative.  Plaintiffs at that point learned for the first time that Vester Defendants had been destroying CFA Cover Sheets.

[37]    At his deposition, Rodney Vester testified that Vester's normal policy had always been to destroy the Cover Sheets and that they were still doing it despite the lawsuit.[12]

[38]    Plaintiffs' counsel immediately wrote to defense counsel requesting that all further destruction of CFA Cover Sheets stop.  By e-mail on July 25, 2007, Plaintiffs asked Defendants "to agree from this day forward not to destroy any of the cover sheets."

[39]    By responsive e-mail on July 27, 2007, the Vester Defendants stated to Plaintiffs that they would not stop destroying the CFA documents, saying that "our client is going to continue with its normal business practice that has been in place for many years."  This refusal by the Vester Defendants came

---

[11] July 21, 2007 Tr., p. 67.
[12] Rodney Vester Dep., pp. 14-18.

after the entry of the court's July 20, 2007 Order compelling discovery of documents that would plainly embrace CFA Cover Sheets.[13]

[40]    On August 2, 2007, Plaintiffs moved the court for an order instructing the Defendants to cease and desist from the destruction of relevant documents in this case, and for other relief.

[41]    Opposing Plaintiffs' motion for an order to stop the destruction, Defendants on August 8, 2007, filed affidavits of Alan Vester and Larry Williamson, which stated that all relevant destruction had occurred before this civil action was filed.  At times material to the Motion, Alan Vester was the president of all the Vester automobile dealerships and Mr. Williamson was the compliance officer for all the dealerships.  They stated that they had engaged in a "historical file review" from September until November 2005, that all files through the summer of 2005 had already been gone through and virtually all Cover She;lets destroyed, and that no purging of documents had happened afterward.[14]  These statements were inconsistent with Rodney Vester's July 23, 2007 deposition testimony.

[42]    On August 13, 2007, this court entered an Order prohibiting further destruction of relevant documents.

[43]    Subsequently, Rodney Vester was deposed again, at which time he testified that "the Cover Sheets were routinely discarded at month end and that after the Deal File review in the fall of 2005, virtually any remaining Cover Sheets

---

[13] *See* Order, July 20, 2007, ¶¶ 3, 6, 9 (production of selected Deal Files and other CFA related documents).
[14] Alan Vester Aff., ¶ 4; Williamson Aff., ¶ 13.

would have been discarded."[15]  This testimony was inconsistent with his prior deposition testimony.

[44]  Alan Vester was deposed and testified that "we do not keep Cover Sheets; the office pulls the cover sheet out to cross reference that with the payroll."[16]

[45]  Vester's own outside accountant, Ralph Moore, testified that he told Vester that accounting records regarding price, cost and cash down must be kept for three years under IRS rules.

[46]  In an October 2007 hearing, Defendants, through counsel, told the court that "90 something percent of the time – that was my guess – but in the vast majority of cases, [Cover Sheets] were thrown away at the end of the month,"[17] and "the point is for class certification, we've admitted the files were destroyed.  We've admitted they were done in the normal course of business, and we've also admitted that Mr. Williamson and Mr. Vester destroyed virtually all, whatever is left, whatever happened to be left, whatever it was."[18]

[47]  Defendants repeated this position in court filings.  "[T]he plain and simple fact is this – the coversheets were routinely destroyed during the normal course of business throughout the history of the Vester dealerships."[19]  "[We] advised plaintiffs' counsel on numerous occasions that in the vast majority of the

---

[15] Rodney Vester Dep., pp. 16-18.
[16] Alan Vester Dep., p. 99.
[17] Oct.22, 2007 Tr., p. 26.
[18] *Id.* at 44.
[19] Def. Resp. Mot. Compel, Nov. 5, 2007, p. 19.

deal files the coversheets do not exist because they were discarded in the normal course of business."[20]

[48]    In agreeing to a limited review of Deal Files for Cover Sheets by defense counsel, Plaintiffs and the court relied upon Defendants' representations.  Defense counsel reviewed the first box of each year for the Selma and Greenville dealerships, and in September 2007 advised that so far no Cover Sheets had been found.[21]  Thereafter, in the course of opposing Plaintiffs' motion for discovery, Defendants reported to Plaintiffs and the court that there were "nine Deal Files that had a cover sheet out of 160 or 170, however many were in the box.  And of those, four actually had something written in on CFA. That's it."[22]

[49]    Plaintiffs own later review of Deal Files contradicted Defendants' representations, as did documents subsequently produced by the North Carolina Division of Motor Vehicles ("DMV") and Regional Acceptance Corporation ("RAC").  The DMV had seized deal files from Vester dealerships in November 2005.  RAC had sued Vester dealerships on March 3, 2006, alleging that Vester had violated its dealer agreement with RAC and provided to RAC information with regard to customer income and employment that was false.[23]

[50]    Defendants opposed Plaintiffs' review of Deal Files, opposed production of DMV and RAC documents, and opposed Plaintiffs' discovery of the documents directly from DMV and RAC.

---

[20] Def. Reply, Nov. 9, 2007, p. 12.
[21] Alan Vester Dep., p. 96.
[22] Oct. 22, 2007 Tr., p. 42.
[23] See RAC Compl., ¶¶ 37, 42-45.

[51]     On December 1, 2006, after reviewing Deal Files produced by Vester in the RAC case, RAC had moved to amend its Complaint so as to allege that Vester dealerships used false down payments that the dealerships documented by an entry labeled CFA on internal accounting documents known as Cover Sheets.  On February 7, 2007, this court granted the motion to amend.

[52]     Documents produced by RAC under subpoena in the instant case reflect that during pendency of the RAC case, Vester produced files to RAC containing numerous Cover Sheets.

[53]     A September 29, 2006 letter from RAC's counsel confirmed that on October 3, 2006 Vester would produce Deal Files for review by RAC.[24]

[54]     After a review of those Deal Files, on October 27, 2006, RAC wrote defense counsel describing "58 deals" with "'CFA' – indicating that we have a copy of Vester's 'deal summary sheet' showing that a false down payment was done vis-à-vis the 'CFA' (or 'Customer Funding Assistance') scheme," and attached a spreadsheet detailing the deal files that "used the CFA fake down payment scheme." [25]

[55]     On November 10, 2006, RAC counsel wrote defense counsel listing files that "have CFA;" Vester had refused to buy back deals despite being "in control of many of the documents . . .  CFA sheets;" noting "the discovery of documents evidencing the fraud (e.g., CFA sheets); attaching a chart with a column for deals with "CFA."[26]

---

[24] Pls.' Br. Supp. Mot. Discovery Sanctions, Ex. 34.
[25] *Id.*, Ex. 35.
[26] *Id.*, Ex. 36.

[56]    On September 3, 2007, RAC's attorney wrote defense counsel returning all of the documents produced in the case, including those with the CFA Cover Sheets.

[57]    However, in October 2007, in the present case, only weeks after RAC returned to Defendants the files with Cover Sheets, Defendants represented to this court, with explicit reference to the RAC case, that "on the Deal File review . . . this is one of the things that quite frankly, Your Honor, and we've had this discussion and I know you've been through this with the RAC case can go out there and spend a ton of attorney time and a ton of money and time, and we told them the coversheets aren't there.  So it's kind of pointless to go sit and look for coversheets when they aren't there."[27]  As the reference to "RAC" shows, Defendants specifically referenced the RAC case, conveying the impression that Cover Sheets did not exist there and thus it was no surprise that they did not exist in the instant case.  These representations to the court are inconsistent with the fact, now known, that only a short time previously RAC had returned to Defendants many Deal Files that contained Cover Sheets.

[58]    DMV seized Deal Files from various Vester dealerships in November 2005.

[59]    Defendants originally stated in August 2007 affidavits filed with the court that when they stopped their Deal File review in November 2005, virtually all Cover Sheets had been destroyed.  If so, there should have been very few Cover Sheets in the files seized by DMV in November 2005.  However, a review

---

[27] Oct. 22, 2007 Tr., pp. 42-43.

of the DMV files shows that over 90% of the files taken by DMV contained Cover Sheets.   Vester's representations are inconsistent with the DMV documents.

[60]   The Deal Files DMV seized were a random sample of late 2004 through late 2005 files.  Since the sample had 90% cover sheets, it is reasonable to expect that the larger mass of 2004-05 files should have reflected a similar percentage.  Yet in 2008 when Plaintiffs reviewed Deal Files maintained by Vester in Littleton, NC, they found that few of the Deal Files had Cover Sheets.

[61]   In 2006, Defendants obtained copies of the Deal Files that the DMV had seized, which were replete with Cover Sheets.[28]  The presence of these Cover Sheets contradicted Defendants' statements that virtually all Cover Sheets had been destroyed.  Defendants, through counsel, admitted by affidavit in response to Plaintiffs' motion for sanctions that when the deal files were returned by DMV, the files with Cover Sheets were "segregated" from other files.

[62]   Defendants did not produce their copies of the DMV documents until January 31, 2008, then the last day of discovery under the existing Case Management Order for this matter.  This production occurred only after the DMV had already produced the documents and only after Plaintiffs were required to compel production over Defendants' objections.

[63]   After the revelation of Cover Sheets in the RAC and DMV documents, Defendants represented that there was not an existing Vester policy to destroy Cover Sheets in the ordinary course of business; that when they went through Deal Files in 2005 they did not destroy virtually all the Cover Sheets; that the 2005 file review did not embrace files through Summer 2005; and that Larry

---

[28] Williamson Dep., p. 132.

Williamson did not stop destroying those Cover Sheets in November 2005. These representations contradicted Defendants' prior representations with regard to the Cover Sheets.

[64]    As an example, Rodney Vester had previously testified that Vester's normal policy had always been to destroy the Cover Sheets.[29]  He testified the Cover Sheets were routinely discarded at month end.[30]  However, after the discovery of the DMV and RAC documents, and Plaintiffs' own file review in Littleton found many Cover Sheets, Rodney Vester testified that there was no set policy on destroying documents.[31]

[65]    Alan Vester originally testified that Vester always had a policy of throwing away Cover Sheets after a file was closed.[32]  After the discovery of numerous Cover Sheets, he testified that there was no set policy.[33]  Asked if he still believed his representations in his own prior affidavit were true, he testified "I have no idea."[34]

[66]    Larry Williamson, compliance officer for all Vester dealerships, admitted in April 2008 that he "disagrees in the language in Mr. Vester's affidavit."[35]

[67]    In their August 2007 affidavits Mr. Vester and Mr. Williamson claimed the reasons for the document destruction included "compliance" and to save file space.  The court is forced to conclude that these statements lack

---

[29] Rodney Vester Dep., pp. 14-18.
[30] Rodney Vester Dep., pp. 16-18.
[31] Rodney Vester Dep., pp. 17-18, 21, 64.
[32] Alan Vester Aff.; Alan Vester Dep., p. 99.
[33] Alan Vester Dep., pp. 12-13.
[34] *Id.* at 29.
[35] Williamson Dep., p. 72.

credibility. For example, when deposed Williamson could not say what those compliance policies were.[36]

[68] In his August 2007 affidavit, Williamson said he burned, shredded and threw out documents. In his April 2008 deposition he testified inconsistently.[37]

[69] Defendants originally represented to the Court at hearing that virtually all the Cover Sheets had been destroyed.[38] They also represented the same in filed briefs. (Def. Resp. Mot. Compel dated Nov. 5, 2007 p. 19). After discovery of the numerous cover sheets, they changed their position.

[70] This civil action was filed in February 2006. Alan Vester testified in April 2008 that he continued to "remove Cover Sheets" until August 2007. (Alan Vester April 2008 Dep. p. 76). It is undisputed that while on notice of a lawsuit alleging claims based in material part on Cover Sheets, Defendants destroyed them.

[71] At the time that Defendants had possession or control of Deal Files containing Cover Sheets, which were produced to RAC and DMV, as well as many deal files with Cover Sheets possessed by Vester, Defendants represented to Plaintiffs and to the court that there were virtually no Cover Sheets remaining.

---

[36] Williamson Dep., p. 133-34.
[37] Williamson Dep., p. 81.
[38] Oct. 2007 Tr., pp. 26, 44.

VI.

CONCLUSIONS OF LAW

A.

<u>Spoliation</u>

[72]    The North Carolina Motor Vehicle Dealers and Manufacturers Regulations ("Regulations")[39] provide that an automobile dealer must document in writing the "amount of cash down payment made by the buyer" and these records must be "retained by the dealer for four years."  The Regulations further provide that in order to obtain a dealer license and do business as a car dealer in our State, the dealer must complete a form certifying to the NC DMV that it is familiar with the all the Dealer Regulations and will comply with them.

[73]    Where there has been improper destruction of documents even without notice of a claim, there can exist spoliation, particularly when the wholesale document destruction flies in the face of legal standards for document retention.  *See McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 188 (*citing Reingold v. Wet 'N Wild Nevada, Inc.*, 113 Nev. 967 (1997).

[74]    In attempting to meet their burden of establishing spoliation, Plaintiffs need not show intentional misconduct.  Rather, the courts evaluate the facts regarding spoliation on a "continuum of fault."  *McLain*, 137 N.C. App. at 184.  Whether the evidence was destroyed or lost accidentally or in bad faith is irrelevant, because the opposing party suffered the same prejudice.  *Id.* (*citing*

---

[39] North Carolina Department of Transportation Division of Motor Vehicles License & Theft Bureau, Motor Vehicle Dealer and Manufacturer Regulation Manual, p. 59 (March 2009), *available at* http:www.ncdot.org/dmv/forms/licensetheft/download/dealerregulationmanual.pdf.

*Hamann v. Ridge Tool Co.*, 539 N.W.2d 753, 756-57 (Mich. Ct. App. 1995)). *See also Teague v. Target Corp. d/b/a Target Stores, Inc.*, 2007 WL 1041191 (W.D.N.C. April 4, 2007) (spoliation appropriate where spoliator acted in bad faith, with gross negligence or ordinary negligence).

[75]    Here, the fact that the Cover Sheets also were relevant to the earlier *Glass* case, the *Jefferson* case, and the RAC case, and the self-contradictory testimony of Defendants as to the details of the destruction, reflects upon knowledge and culpability of Defendants.  "[T]o qualify for the adverse inference, the party requesting it must ordinarily show that the 'spoliator was on notice of the claim or potential claim at the time of the destruction.'" *McLain*, 137 N.C. App. at 187 (*quoting* Robert L. Tucker, The Flexible Doctrine of Spoliation of Evidence: Cause of Action, Defense, Evidentiary Presumption, and Discovery Sanction, 27 U. Tol. L.Rev. 67, 79 (1995)).

[76]    The Cover Sheets destroyed by Defendants constituted evidence that was pertinent and potentially probative on issues raised in Plaintiffs' case. *Arndt*, 170 N.C. App. at 521.  The Cover Sheets supported Plaintiffs' contentions that Vester used a common practice of false down payments recorded under a CFA entry.  The probative nature of the Cover Sheets was known to Vester, and by destroying the Cover Sheets, Vester destroyed evidence probative of the Plaintiffs' claims.

[77]    For purposes of the class, Defendants' conduct prejudiced Plaintiffs in their ability to identify class members from the population of Vester car buyers by simply comparing a bill of sale to a corresponding Deal File Cover Sheet and

identifying buyers where the CFA amount equals the cash down reflected on the bill of sale. Plaintiffs are entitled to measures to address the prejudice to the class.

[78] Plaintiffs therefore have established spoliation by Defendants, and are entitled to an inference that the evidence destroyed would have assisted them. *Arndt v. First Union Nat. Bank*, 70 N.C. App. 518, 526-27 (2005); *McLain* at 182-85.

[79] As a result of spoliation by Defendants, Plaintiffs are entitled to (a) an appropriate spoliation jury instruction at trial with regard to inferences raised by the absence of Cover Sheets; and (b) have this court discount any arguments by Defendants against class certification that are premised upon the absence of Cover Sheets, which the court has done under separate Order of even date herewith.

B.

Sanctions.

[80] As a further result of Defendants' spoliation and violation of appropriate discovery orders of the court, Plaintiffs are entitled to sanctions against Defendants, in the court's discretion. *See Praxair, Inc. v. Airgas, Inc.*, 2000 NCBC 10 (inference of spoliation "serves to restore the prejudiced party to the same position he would have been in had the destruction of relevant documents not occurred").

[81] When imposing sanctions, "the trial court has discretion to pursue a wide range of actions both for the purpose of leveling the evidentiary playing field

and for sanctioning the improper conduct." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995) (cited by Judge Tennille in *Praxair, supra*). The court can strike pleadings or claims. *See Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001) (dismissing claim as a result of spoliation). The court has discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 590. The court also may consider the prejudice caused to the other party. *Id.* at 593.

[82]     Here, with regard to evidence of Cover Sheets and CFA entries, Defendants made inconsistent representations as to discovery and the status of documents, obstructed efforts to obtain discovery in violation of orders of the court, destroyed relevant documents outright and made inaccurate representations to the court. Since the spoliation issue first arose, the Plaintiffs and the court were required to expend additional resources due to Defendants' spoliation, obstruction of discovery, and contradictory testimony and representations to the court. As a result, Plaintiffs undertook discovery initiatives and engaged in motion practice before the court on the issue of spoliation that otherwise would not have been required.

[83]     The scope of discovery is intentionally broad, and discovery is not meant to be a game of hide and seek. The purpose of the discovery rules is "to prevent a party who has discoverable information from making evasive, incomplete, or untimely responses to requests for discovery." *Green v. Maness*, 69 N.C. App. 292, 299, cert. denied, 312 N.C. 621 (1984). Courts further have specified that "in addition to its inherent authority to regulate trial proceedings,

the trial court has express authority under G.S. 1A-1, Rule 37, to impose sanctions on a party who balks at discovery requests." *Id.*

[84]    "The choice of sanctions under Rule 37 lies within the court's discretion and will not be overturned on appeal absent a showing of abuse of that discretion."  *Vick v. Davis*, 77 N.C. App. 359, 361 (1985), *aff'd*, 317 N.C. 328 (1986) (quoting *Routh v. Weaver*, 67 N.C. App. 426, 429 (1984)).  This court has broad discretion to "make such orders in regard to the failure as are just," including prohibiting the introduction of evidence, striking pleadings or imposing judgment.  Rule 37(b)(2); *F. E. Davis Plumbing Co., Inc. v. Ingleside W. Assocs.*, 37 N.C. App. 149, 153, *cert. denied*, 295 N.C. 648 (1978); *Brooks v. Giesey*, 106 N.C. App. 586, 592 (1992), *aff'd*, 334 N.C. 303 (1993); *Frost v. Mazda Motor of Am., Inc.*, 353 N.C. 188, 199 (2000).

[85]    Plaintiffs contend that under the circumstances of this case, Defendants have purposely obstructed and evaded discovery.  Among other things, Plaintiffs ask the court to strike Defendants' Answer.  It is true that there are circumstances in which it is proper to strike a recalcitrant party's responsive pleadings.  *Atlantic Veneer Corp. v. Robbins*, 133 N.C. App. 594, 599 (1999) (trial court's decision to strike defendant's answer and enter default affirmed); *Silverthorne v. Coastal Land Co.*, 42 N.C. App. 134 , *rev. denied*, 298 N.C. 300 (1979); *Hammer v. Allison*, 20 N.C. App. 623, *cert. denied*, 285 N.C. 233 (1974); and *Fulton v. East Carolina Trucks, Inc.*, 88 N.C. App. 274 (1987).  However, such a remedy would impose the harshest of sanctions, which the court deems would be too harsh when weighed against the Defendants' conduct in this matter.

Consequently, in the exercise of its discretion the court declines to strike Defendants' Answer or other responsive pleadings in this case.

[86]    In addition to striking a disobedient party's pleadings, the court is authorized to require the party failing to obey a lawful discovery order to pay the reasonable expenses of other parties, including attorney's fees, caused by the failure.  Rule 37(b)(2)(e).  In this matter, the court concludes that it is appropriate to impose such a sanction upon Defendants.

NOW THEREFORE, based upon the foregoing FINDINGS and CONCLUSIONS, it hereby is ORDERED that:

[87]    The Plaintiffs' Motion for Discovery and Spoliation Sanctions should be, and hereby is, GRANTED, in part, as reflected herein.

[88]    At trial of this matter, Plaintiffs shall be entitled to an appropriate spoliation jury instruction with regard to inferences raised by the absence of Cover Sheets.

[89]    This court will discount any arguments by Defendants against class certification that are premised upon the absence of Cover Sheets.

[90]    As sanctions for their misconduct, and in the discretion of the court, Defendants shall reimburse Plaintiffs' counsel for fees and expenses incurred by them relative to the spoliation issue.  The amount of such sanctions will be determined by the court at an appropriate time.

[91]    Plaintiffs shall submit, within 30 days of the date of this Order, an affidavit of attorney fees and expenses they contend were incurred due to Defendants' misconduct related to the spoliation issue.  With regard to any fees

and expenses Plaintiffs seek to recover, the affidavit shall reflect in detail the (a) time and dates of services, (b) the substance of any service and the identity of the person rendering the service, (c) the attorney and staff hourly rates charged or paid and (d) details of any other actual out-of-pocket expenses sought. Plaintiffs also shall submit a brief or memorandum concisely stating Plaintiff's position with regard to which fees and expenses they contend properly should be charged to Defendants, and why. Defendants, and thereafter Plaintiffs, shall be entitled to respond to Plaintiffs' submission as provided in Rule 15, Business Court Rules. The court anticipates it will rule on the basis of the record before it, and that further hearing on the spoliation or sanctions issues will not be necessary.

[92] Except as specifically granted by this Order, the Plaintiffs' Motion is DENIED.

This the 17th day of July, 2009.